**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

GREGORY JOHNSON                                                                                  PLAINTIFF

V.                                      NO. 2:10CV00139 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                          DEFENDANT

**MEMORANDUM AND ORDER**

**I.  Introduction**

Plaintiff, Gregory Johnson, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Both parties have filed Appeal Briefs (docket entries #11 and #12), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind

might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On August 30, 2007, Plaintiff filed applications for DIB (Tr. 117-119) and SSI (Tr. 114-116) alleging disability since July 21, 2007. In his "Disability Report — Adult" (Tr. 134-154) he reported that "back problems, high blood pressure and diabetes" limited his ability to work. (Tr. 135). After Plaintiff's claims were denied at the initial and reconsideration levels, he requested a hearing before an Administrative Law Judge ("ALJ").

On September 15, 2009, the ALJ conducted an administrative hearing. (Tr. 31-49). Plaintiff was the only witness.

At the time of the hearing, Plaintiff was 36-years old (Tr. 35). He started but did not complete the twelfth grade of high school. (Tr. 36). His past relevant work included a job at a shirt factory in the packing and shipping department (Tr. 38-39),

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

work delivering office equipment (Tr. 39), and jobs at Wendy's and McDonald's. (Tr. 39).

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has a "severe" impairment, *i.e.*, an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 404.1520(a)(iii), § 416.920. If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 404.1520(4)(iv), § 416.920. If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.*, § 404.1520(4)(v), § 416.920. If so, benefits are denied; if not, benefits are awarded. *Id.*

In his March 16, 2010 decision (Tr. 11-19), the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since July 21, 2007, his alleged onset date; (2) had severe impairments consisting of "a history of degenerative disc disease and associated musculoskeletal [problems] and hypertension;" (3) did not have an impairment or combination of impairments meeting a Listing; (4) had the RFC to "perform the full range of light work;" (5) could not perform his past relevant work; but (6) applying the Medical-Vocational Guidelines, there were other jobs available in significant numbers that Plaintiff could perform. Thus, the ALJ concluded that Plaintiff was not disabled.

On September 8, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 1-3). Plaintiff then filed his Complaint appealing that decision to this Court. (Docket entry #2).

## II. Analysis

In Plaintiff's Appeal Brief, (docket entry #11) he argues that the ALJ erred: (1)

in determining that his RFC allowed him to perform light work; (2) in evaluating his credibility; and (3) in relying on the Medical-Vocational Guidelines at Step 5. Because Plaintiff's first two arguments have merit, the ALJ's decision must be reversed and the case remanded for further administrative proceedings.[2]

### A. The Medical Evidence Does Not Support The ALJ's Determination That Plaintiff's RFC Allowed Him To Perform A Full Range Of Light Or Sedentary Work

Plaintiff is 6'2" tall and weighs around 273 pounds. (Tr. 37). In early 2007, he began to experience significant pain in his lower back. In treatment notes, dated July 30, 2007, Dr. Martin Greenberg, a neurosurgeon at Baptist Health Neurosurgery, described Plaintiff as having a seven month history of significant low back pain, which had only a "minimal response to NSAIDs, narcotics, and physical therapy." A lumbar MRI revealed "large central disc herniations at L3-4, L4-5, and L5-S1, and severe spinal stenosis." There was "no associated bowel or bladder dysfunction." (Tr. 228). To control his pain, Plaintiff was taking hydrocodone and naproxen.[3] *Id.*

---

[2]Because medical evidence does not support the ALJ's determination that Plaintiff's RFC allowed him to perform a full range of either light or sedentary work, the ALJ also erred in using the Grids at Step 5. Because that error is subsumed in the Court's discussion of the first two errors, it requires no separate analysis.

[3]On July 30, 2007, Dr. Greenberg restricted Plaintiff to no work for two months; physical therapy 2-3 times a week for 4-8 weeks; and 2 more steroid injections. (Tr. 229). On the same date, Dr. Greenberg also signed a note allowing Plaintiff to return to part-time work, with the following restrictions: "no lifting more

Dr. Greenberg scheduled Plaintiff for a "series of right L3-4 lumbar epidural steroid injections at Baptist Health Radiology." (Tr. 232). Plaintiff received these injections on July 30, 2007 (Tr. 220-221) and on August 16, 2007. (Tr. 218-219). However, they provided him with only limited relief for his pain.

On December 18, 2007, Plaintiff was seen for back pain by Dr. Edward Vanderburg, a physician at the White River Rural Health Center. His notes reflect that: (1) Plaintiff had lost his job and related disability income; (2) Plaintiff's well documented spinal stenosis and pain was "worsening as he [Plaintiff] now describes problems with impotence and urinary incontinence." Dr. Vanderburg prescribed Lortab and naproxen to help control Plaintiff's pain and "urged Plaintiff to keep his next appointment at UAMS neurosurgery as another no-show may alienate him from the only treatment source that is not cost prohibitive." (Tr. 288).

Dr. Vanderburg's treatment notes on January 31, 2008, reflect that Plaintiff needed his prescriptions refilled to help him control his back pain and that Plaintiff "is ready to have [back] surgery at UAMS." (Tr. 286).

On February 20, 2008, Plaintiff had an MRI of his lumbar spine at UAMS.

---

than 5-10 pounds; work no more than four hours per day." (Tr. 222). Finally, on August 30, 2007, Dr. Greenberg allowed Plaintiff to return to regular duty work, beginning September 5, 2007, "with no restrictions." (Tr. 227).

According to the notes of Dr. Ali Krisht, a neurosurgeon at UAMS, this MRI revealed "L3-L4, L4-L5 and L5 -S1 disc hypointensity suggestive of disk desiccation." (Tr. 360).

On April 28, 2008 Plaintiff was seen by Dr. Henry Allen, another physician at the White River Rural Health Center. His notes reflect that Plaintiff needed stronger medication for his lower back and radiating leg pain. (Tr. 284).

On May 8, 2008, Plaintiff was seen by Deborah Kail, an APN at White River Rural Health Center. She noted Plaintiffs "chronic back pain" and prescribed Lortab to help him control the pain. (Tr. 282).

On July 29, 2008, Plaintiff was seen again by Dr. Vanderburg for a refill of his prescription for Hydrocodone to help control his back pain. Dr. Vanderburg noted that:

> MRI revealed severe spinal stenosis. [Plaintiff] needs surgery but has no insurance. Working on Medicaid.

(Tr. 278).

On September 24, 2008, Plaintiff saw Dr. Vanderburg and complained of chronic back pain. Dr. Vanderburg refilled his prescription pain medication and noted that Plaintiff was "waiting on Medicaid to start so he can have surgery" which was recommended by a UAMS neurosurgeon. (Tr. 274).

On January 22, 2009, Plaintiff was seen by Dr. T. Glenn Pait, a neurosurgeon at UAMS. Plaintiff described his lower back pain as "sharp and shooting" and "precipitated with any movement and while lying in bed." He confirmed continuing episodes of bladder incontinence and stated he was taking hydrocodone and acetaminophen to help control his pain. (Tr. 332).

An MRI at UAMS, on January 22, 2009, revealed at L3-L4 "moderate degenerative disc disease and degenerative facet arthrosis in the lumbar spine," with a "moderate generalized disc bulge . . . and right foraminal disc protrusion . . . moderate canal stenosis . . . and right foraminal narrowing, with infringement upon the existing right L3 nerve root."[4] (Tr. 336).

Dr. Pait noted that the previous steroid injections did not alleviate Plaintiff's pain, nor did the physical therapy, which only had a "minimal effect" on his pain. Accordingly, Dr. Pait discussed surgical intervention and the related surgical risks. According to Dr. Pait's notes, Plaintiff stated he understood the risk "and has decided to proceed with surgery." Dr. Pait stated that he planned "to schedule [Plaintiff] for an L3-L4 right-sided lumbar discectomy." (Tr. 333-334).

Subsequently, Plaintiff was diagnosed with diabetes. Beginning in May of

---

[4]Comparing the MRI results at L3-L4 taken on February 20, 2008 (Tr. 360) with the images taken on January 22, 2009, reveals a worsening condition that now involves impingement of the L3 nerve root.

2009, and continuing through August of 2009, Plaintiff's monthly appointments at White County Rural Health Center reflect that: "His [back] surgery was postponed due to newly diagnosed diabetes . . . ." (Tr. 399, 397, 395, 393).

On December 10, 2009, Plaintiff was again seen by Dr. Pait at UAMS. He noted that: (1) Plaintiff's pain continued and radiated into his lower right extremity; and (2) Plaintiff had "requested urgent surgery." Dr. Pait's impression was "lumbar diskogenic disease." While Plaintiff indicated he wanted to have surgery as soon as possible, Dr. Pait explained that, at UAMS, patients in Plaintiff's situation (no health insurance or money) were "triaged" and that it might be some time before his surgery could be scheduled. (Tr. 427).

On May 4, 2010, at the request of Dr. Vanderburg, Plaintiff received another MRI at UAMS. It revealed the following: (1) "multilevel degenerative changes involving the lumbar spine with disc desiccation from L3-L4 to L5-S1 levels are again seen;" (2) a broad based disc protrusion is again seen at L5-S1; (3) a central focal disc protrusion is again seen at L4-L5, with moderate thecal sac compression; (4) at L3-L4 a central focal protrusion is present, with moderate to severe thecal sac compression; and (5) at L2-L3 there is a right paracentral focal disc protrusion and mild thecal sac compression. The "impression" was essentially the same as the prior study dated January 22, 2009: (1) a local disc protrusion with annular tear and mild thecal sac

compression at L2-L3; (2) a central disc protrusion at L3-L4, with an annular tear and moderate to severe thecal sac compression; and (3) a central focal disc protrusion at L4-L5, with moderate thecal sac compression. (Tr. 421-422).

The ALJ did not request that Plaintiff be examined by a consulting specialist. A reviewing physician examined Plaintiff's medical records on October 17, 2007, and concluded that Plaintiff could perform medium work. However, in his decision, the ALJ assigned little weight to that opinion because "it was rendered early in the disability process and does not adequately consider . . . the combined effects of his impairments."

Thus, the *only medical evidence* available to the ALJ, in formulating Plaintiff's RFC, consisted of the foregoing treatment records generated by physicians at UAMS and the White River Rural Health Center. "[A] claimant's RFC is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) (*quoting Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).

In his decision, the ALJ repeatedly mischaracterizes the medical evidence in an effort to minimize the seriousness of Plaintiff's herniated disc, with nerve root impingement, and serious spinal stenosis. "[T]he ALJ is not free to ignore medical evidence but rather must consider the whole record." *Reeder v. Apfel*, 214 F.3d 984,

988 (8th Cir. 2000).

First, the ALJ cites Dr. Greenberg's decision to allow Plaintiff to return to work on September 5, 2007, with no restrictions. However, the ALJ fails to mention that Dr. Greenberg did so only after requiring Plaintiff to take off 2 full months from work in hopes that his lower back problems would improve. The ALJ also fails to mention that, a few months later, on December 18, 2007, Plaintiff had lost his job due to his back problems, "his pain is worsening" and his back problems were now causing him to suffer impotence and urinary incontinence. In other words, his lower back problems had significantly worsened.

Second, the ALJ neglects to mention that, throughout 2008, Plaintiff was receiving hydrocodone, Lortab, and other medications to control his lower back pain while he tried to get on Medicaid so that he could have the lower back surgery recommended by neurosurgeons at UAMS.

Third, the ALJ refers to treatment notes, dated December 15, 2008, (Tr. 293-294), which reflect that "while the Plaintiff complained of neurologic pain in the lower legs, he had good sensation in the lower extremities." (Tr. 17). Dr. Cole's finding that Plaintiff had "good sensation in his lower extremities" in no way detracts from his other far more important findings that Plaintiff had chronic lumbar pain and spinal stenosis of the lumbar region, which Dr. Greenberg (a neurosurgeon) believed

required surgery.

In the same vein, the ALJ recites portions of medical notes reflecting that Plaintiff's strength in his "*upper extremities*" was 5 out of 5, but ignores other far more relevant portions of those medical notes reflecting that Plaintiff's lower back problem was worsening and causing him increasing pain in his "*lower extremities*," along with incontinence.

Finally, the ALJ notes that, "although surgery has been recommended for the claimant, there is no clear indication in the record that the claimant had surgery to repair the herniated disc." (Tr. 17). To the contrary, the record is clear that Plaintiff has *not* had the recommended surgery because: (1) shortly after deciding to have it, in January of 2009, Plaintiff was diagnosed with diabetes and wanted to stabilize that condition prior to surgery; and (2) in December of 2009, when he told Dr. Pait that he "urgently" wanted the surgery, he was told that, without health insurance or the ability to pay for the surgery, he would have to go on a waiting list at UAMS. Of course, none of this is mentioned by the ALJ in his decision. *See* Social Security Ruling 96-7p (an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering . . . information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment," including "[t]he

individual's [inability] to afford treatment [or obtain] access to free or low-cost medical services")

Suffice it to say, there is simply *no medical evidence* which supports the ALJ's determination that Plaintiffs RFC allowed him to perform a full range of light work. While the Commissioner argues that a full range of sedentary work is subsumed in the ALJ's determination that Plaintiff can perform a full range of light work, the medical record also contains no support for Plaintiff being able to perform a full range of sedentary work. Thus, the ALJ's RFC determination is supported only by his sheer speculation about the level of work he believes Plaintiff can perform. This falls far short of the required substantial medical evidence necessary to support an RFC determination.

### 2. The ALJ's Credibility Analysis Fails To Meet The *Polaski* Requirements

"When examining a claimant's subjective complaints, in addition to objective medical evidence and the claimant's prior employment record, an ALJ must also examine: (1) 'the claimant's daily activities'; (2) 'the duration, frequency and intensity of the pain'; (3) 'precipitating and aggravating factors'; (4) 'dosage, effectiveness and side effects of medication'; and (5) 'functional restrictions.'" *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) (*quoting Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th

Cir. 1984)).

Here, the ALJ's entire analysis of his reasons for discounting Plaintiff subjective complaints of pain is contained in four brief sentences:

> However, he stated that he does light cleaning, which he stated [sometimes] takes him all day to complete. Furthermore the claimant stated that he was able to pay bills, count change, handle a savings account, and use a checkbook/money orders. Also, he stated that he was able to prepare his own meals on a daily basis; and was able to go shopping for food and personal items at least once a month for 2 hours. This strongly suggests that the claimant is able to function at a far greater degree than he alleges.

(Tr. 15). This falls far short of the meaningful credibility analysis required by *Polaski*. Furthermore, the very limited nature of the activities cited by the ALJ in no way supports his sweeping conclusion that they "strongly suggest that the claimant is able to function at a far greater degree than he alleges."

### III.  Conclusion

On remand, the ALJ should carefully update the medical record and ensure that he obtains and considers all of the medical evidence to support his RFC assessment. The ALJ should also reassess Plaintiff's credibility using the *Polaski* factors and utilize a vocational expert at Step 5.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings

pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 25th day of October, 2011.

```
_____
UNITED STATES MAGISTRATE JUDGE
```